Good morning. D. Dan Loren for Mr. Asker. I'd like to reserve three minutes of my time for model. Judge Bob, Judge Heinrich, Judge McKee, I want to thank you for giving me the hope that it will be helpful to the court. Excuse me. Everybody's taller than I am. Because the first two issues that we raise, raise similar but distinct claims regarding two different searches. I thought it might be helpful to kind of walk back through the factual background, the history of the searches and of the issues that we raise in relation to them. In April of 2010, the DEA, IRS investigators launched a wiretap investigation, excuse me, secured wiretap authorization for a phone which was used by a fellow named Ramiz Golozi. During the course of that interception, they applied for another Title III order authorizing the interception of wire communications on a telephone used by a fellow named Arkan Suma. Mr. Suma ultimately became a defendant in the same indictment which Mr. Asker was charged, pled guilty to a one Title XXI, Title XXVI count, I'm sorry, but did not appear as a witness at trial for either side. In the course of the interception of the telephone used by Mr. Suma, Mr. Asker was intercepted and some of the calls from that interception, some of those intercepted phone calls were used as evidence at Mr. Asker's trial. In addition, and perhaps more importantly, the information from this wiretap, the second wiretap, the Suma wiretap, was used to procure a physical search warrant for Mr. Asker's offices and the offices that were used by some 60 or so entities, franchisor and franchisee entities, under the general corporate umbrella of Happy's Pizza. That search warrant was executed in August of 2010 and really led to the acquisition of probably the most important evidence that was ultimately offered at trial. Excuse me. The premise of both of these Title III applications was that wiretaps were necessary and appropriate to investigate ongoing drug trafficking, large-scale drug trafficking, and the laundering of proceeds of that trafficking, and specifically the investigatory premise was that the drug money was used by franchisee entities. And, of course, the premise was that these activities, the drug trafficking and money laundering, were ongoing, else there would have been no reason, justification for the use of wiretapping. Now we challenged both the Suma wiretap and the physical search warrant affidavit on the APA special agent, who was the affiant, had affirmatively misrepresented the nature of the drug trafficking such as it was that was going on between the anticipated participants in the communications to be intercepted. When you say nature, are you focusing only on what you argue is the lesser amounts involved or was there anything else as to the, quote, nature? No, I think, no, it's not so much that there are lesser amounts, but that as a necessary and logical consequence of that, there is not going to be the production of drug proceeds that need to be laundered, which was the ultimate, the ultimate investigative goal, that is to trace the proceeds of drug trafficking to a legitimate business, a pizza franchise. If you are buying ounces of marijuana to a perhaps hourly basis, that's not going to generate proceeds to launder, and that's what the great significance in our view was, because in both, in relation to both the Title III application and the Rule 41 search warrant, the only evidence or the only alleged evidence of ongoing drug trafficking, of anything approaching contemporary drug trafficking, were these dealings that the agents well knew were not going to be generating proceeds to be laundered. So they didn't, did they not also have information about, from an informant and from a trash pull? I mean, the tape was, the summa gallotsi conversation about beast laws was not the only thing. The residuum, it's our position that the residuum of the affidavit is simply insufficient to justify either a Title III intervention, an interception, or the kind of sprawling all-record search which the affidavit, excuse me, which the Rule 41 warrant allowed. There was evidence that... Well, I was focusing on the first wiretap though. We haven't gotten to the scope yet. Okay. The wiretap part... Right. It's the same argument. The residuum of the affidavit, of the residuum of the problem of cause showing, was essentially the same for both the Title III and the Rule 41 motion, the Rule 41 application. One, there had been a trash pull that produced a document with names of people who were associated in various ways with the various Happy's Pizza franchise, franchisee organizations, and with the corporate, the franchisor organizations. These were managers, owners. There were hundreds and hundreds of names. From this, the affidavit identified six people who had histories of being connected or implicated in drug investigations. Some of these histories went back to over a decade, and none of them were current. There was informant information. An informant apparently reported that he or she had been told by a manager of one of the franchisee operations that the Happy's Pizza franchises were open only to lawbreakers, drug dealers, and other miscreants. The basis for that information, why this employee thought that or believed it was nowhere stated or why the informant felt that that was information that... The informant, I thought, also had a conversation with Galozzi, said to be a known drug trafficker, about, you know, you should get a franchise because that's a way to launder money. I believe there was another informant, but there was such information. That's correct. The conversation with Galozzi about this is the way to launder money was also... I'm not sure that that's the reading that I give that paragraph. I don't believe, I think what Galozzi was reported to have said was not this is a good way to launder money, but rather, this is a good investment if you've got the money. Okay, we can look at it. We're on the same page of what to look at. Thank you. In addition, and I think this is important, the other informant, the one who reported having this suspicious conversation with some Happy's Pizza franchise employee, then went to, contacted, I believe, our consumer to get some information about, well, how do I get on this supposed gravy train? He was directed to an employee of the Happy's Pizza franchisor entity and essentially called and never got a call back. I mean, the fellow, Bashi was his name, said, well, I'm busy now. I'll call you. And then not only did he not return the call, but the informant's later call simply went unanswered. So the probable cause showing of the affidavit, absent the allegations of ongoing drug dealing, in our view at least, does not present, doesn't offer anything like probable cause to believe that the investigative goal can be forwarded by the searches to be conducted, either the wiretapping or the I'm sorry. There's a lot of that around. Take your time. I'm very sorry. Take your time. I did this in front of Judge Thornton, who was a long-sitting judge in our court. And I remember walking around with water and he stopped me, said, Mr. Oren, this is not a bar room. Anyway. Well, you can have the bar room. The problem is we like to get your voice on tape. That too. You'll stay close to it. You can drink the water. Go ahead. We'll give you the extra time. We were talking about the search. So the question, let's assume just for the moment that we don't buy the wiretap part. What do you have to defeat the search if we accept the wiretap? Or do they fall strictly together? That is, if you find that the wiretap was okay, do you have anything extra to defeat the search? I think I have overbreadth on the Rule 41 motion, on the Rule 41 warrant. There were, it seems to me very clear that while the warrant does not say all records, I can't, I just can't think of a kind of record that was not covered by its description. In order to justify an all-record search of a business entity, or in this case, 60-odd entities, the required showing is that it is permeated by unlawful activity. Our view, our reading of the probable cause showing, either with or without the Franks challenge, simply does not rise to that level. And that's what I got. I'll give you an extra minute for the water if you want to say anything else. I'd like to, if I can, let me talk really quickly then about the government Exhibit 597. When the government executed the search warrant in August of 2010, it seized a number of handwritten accounting documents, the condom books, in which franchisees kept daily records of expenses and sales. There was ultimately no evidence of and no charges relating to money laundering, but these documents became the key to the government's, to the charges that were brought against Mr. Asker and the others. They were in the indictment, in the government's Rule 16 expert witness showing, the focus, and of course, the focus was on this very limited number of stores for which the government had these handwritten records, which admittedly, in some instances, were at variance with the numbers that were reported on the tax returns. There is no question about that. Throughout trial preparation, throughout the forensic analysis that we undertook, that was ultimately testified for the defense, this was the focus. The, on the evening after the fourth day of trial, Exhibit 597 shows up. The government council says, well, you know, we just didn't know we had it. I sure didn't know we had it. And it changed everything about the case. The government now could allege, based on, and did allege, and did argue, based on graphic documentary evidence that this, that this was a, there was systemic understatement of income and understatement, or at least the understatement of income. Counsel, my only question on this is, as I understand it, then Asker did testify a day or so later, so you'd had some more time to work on that. Do you argue that Asker would never have testified if that didn't come in? Oh, no, that's not, that's not, not a trial strategy. Okay, I think, I think we've got your point. Thank you very much. You'll have your two minutes for, three minutes for rebuttal, three minutes for rebuttal. Good morning, may it please the court. Greg Knapp for the United States. I'd like to begin by addressing the standing limitation that the defendant faces with respect to his challenge to the wiretap. It's established law that an interceptee of a wiretap on somebody else's phone has standing to challenge only those conversations in which they participate. And so for this case, that means that Mr. Asker has standing to challenge the wiretap, but only with respect to the single conversation between him and our consumer that was ultimately introduced at trial. And so the, the practical upshot for purposes of appeal is that everything that's encompassed in defendant's issue one, about the wiretap, about drug quantities, et cetera, reduces to the single inquiry of whether or not the district court judge admitted the single conversation at trial. A single conversation that lasted less than one minute in which neither party discussed any criminal activity, and which was admitted during the course of a nine day trial in which hundreds of other exhibits were admitted. And so as we detail in our brief, the case for a harmless error is clear, combined with standing. Now I'm not suggesting that the court need resort to harmless error. We think it's a good wiretap on the merits. Nevertheless, if, if the court were searching for a clear path to resolve the defendant's issue one, that would be one way to do it. As to the merits of the wiretap affidavit, I did not read defendant's brief to suggest that he is challenging the probable cause showing on the face of the affidavit itself, but rather to challenge the veracity of certain statements regarding drug quantities. In particular, the defendant pointed to statements in the wiretap affidavit regarding Suma and Galozzi's conversations about business. But the difficulty for the defendant is that he cannot point to any false statements in that affidavit. The affidavit correctly stated that Bisla was an amount of marijuana. And that statement was not even misleading because as, as agent Swinzeki, the lead agent testified during a Frank hearing in this matter, he was never able to determine for certain what Bisla meant in any certain context. And so therefore he correctly referred to it as his belief as being merely an amount of marijuana. In the alternative, even if there were misrepresentations, that's the drug quantity, the, the, the wiretap affidavit would still be upheld because the balance of the material included in the affidavit established probable cause. And those, and those facts included the fact that there were intercepted conversations between Galozzi and Suma regarding distribution of drugs. Now, I appreciate that the defendant disputes what quantities those involved in, were involved in those transactions. But regardless of what quantities were involved, we have a moderate conversation in which these individuals were talking about buying and selling drugs. In other words, distribution. And so that would properly add to the analysis of probable cause irrespective of whether they're dealing with ounces, Bislas, any other quantity. It's still a piece of... How do you get into money laundering into that? Because there was also evidence, as was brought up earlier, from two confidential sources indicating that Happy's Pizza stores were being used to launder money. And that was based on two confidential sources' conversations with Galozzi, who had ties to Suma and therefore Happy's Pizza, and also with a conversation with a store manager. That was part of the evidence. Also, there was additional evidence regarding Arkin Suma's conversations with other individuals, not merely Ramiz Galozzi. And that was obtained through the pen register toll record information that was cited in the affidavit, indicating that Mr. Suma had multiple contacts with not just Galozzi, but also all of the other targets who were described in the wiretap affidavit. Targets who themselves had history of drug distribution. Beyond that, there was the previously mentioned trash pull from the Happy's Pizza corporate office, wherein it was discovered a list of contacts were maintained for each of the various stores, and several of those contacts also had drug distribution. And so that formed the probable cause for money laundering in addition to drug distribution. As to the warrant, just as a statement from the wiretap, here too, the defendant, at least as I read it in his brief, did not directly challenge the warrant affidavit showing a probable cause on its face, but rather pointed to alleged misrepresentations as to drug quantity. But here again, there was no false statements, as could provide the defendant relief under Franks v. Delaware, because the only statement that the defendant highlighted in his submission was a lead agent's reference to his belief that at one point, our consumer was selling a half, which he interpreted to mean a half pound of marijuana. But that merely set forth the agent's belief. And despite having the opportunity to do so at a hearing that was held during the District Court proceedings, the defendant has not established that Agent Swinzycki was providing knowingly false statements, averring as to his belief that this involved a half pound of marijuana. Can you ask specifically about this material that's now in the briefs that other agents knew now that Bislas was being used for smaller quantities, not larger quantities? He was asked about that. In particular, he was asked about a June 17, 2010, interception that was monitored by a different agent. Of course, June 17 is six days after June 11, when the wire tap order was issued. And so it's less probative in that respect. But in any event, the agent testified that although it appears from that particular line sheet that in that context, it was interpreted that Bisla meant ounce. The agent also testified credibly, more generally, that he couldn't necessarily conclude that in any particular conversation, they were always using Bisla to refer to ounces. He also testified that he didn't have the... In terms of his knowing misrepresentation, it would turn on a credibility determination on that. That is, the judge might have said, yeah, okay, I figure you're lying about that. She might have, but she didn't. Now, I appreciate that... I mean, it's the difference between a matter of law and a matter of credibility. Exactly, credibility of an issue. Now, I appreciate that Mr. Loren has pointed out in his submissions that there was no detailed extensive written opinion wherein Judge Hood detailed line by line which statement she found false and which she found to be truthful. Nevertheless, the judge held this two and a half hour hearing during which she observed the agent's responses to these questions about drug quantities and other matters. And she ultimately found that he acted in good faith. And so implicitly... Correct me if I'm wrong, it looked like she said, I'm going to give an oral decision and I'll put something in writing later, but I take it she never did. She did not, except to finally issue just a brief order saying that for the reasons articulated at the prior hearing, the motions are denied. But it's true that there's no extensive written opinion. But as I say, that really shouldn't weigh on how this court reviews the lower court's decision because as I said, there was this subsequent motion hearing where the court explained her reasons for denying the motions. And she referenced the fact that in denying that motion, she was taking into account this Frank's hearing that was held where she had the opportunity to observe the credibility of the agent. And this court, of course, should not discount those proceedings by the lower court. Briefly again on the warrant, again, the alternative, the balance of the warrant would establish probable cause for the offenses under investigation. Because again, we have information from confidential sources regarding the use of Happy's Pizza Stores to launder drug money that was corroborated by the trash poll that was already mentioned regarding drug traffickers ties to Happy's Pizza, also corroborated by the tax return data that the government pulled and which is cited in our brief. There was also the reference to an arrest in 2010 of one Mark Marcos for drug crimes where it was learned that Mark's brother Jeffrey was helping his father invest money into Happy's proceeds. That's again, another piece of information that's properly considered as part of the totality of the circumstances inquiry as set forth in our brief. Because Mr. Loren brought up, I would briefly comment on the overbreadth claim. This warrant and this description of the items to be seized was sufficiently specific in light of the nature of the investigation. And that was an investigation wherein investigators need evidence of money laundering. And so they needed enough records that would allow them to do the tracing analysis that would be necessary for such a money laundering investigation. Mr. Loren asked or averred to the fact that he couldn't think of any records that might not be seized under this warrant. Well, there are some. And generally, those would be records that cannot reasonably be expected to show the flow of money in and out to the investors as well as the investor's identity and whether or not they were linked to drug crimes. Those might include HR files, personnel records, at least those not tied to employee compensation or profits, trade secrets. After all, this is a pizza operation. Mr. Asker testified about other aspects of the business besides those dealing with franchising new stores, in particular Happy Pizza's food, which was an arm of the corporation that he used to sort of speculate on food prices and try to negotiate favorable supplier contracts so that he could gain the cost savings from that. Warren didn't mention anything about that. No market research, no negotiations that would be associated with that. And so this was not an all-record search just by a simple reading of it. And finally, again, because Mr. Loren brought it up, I would like to briefly comment on Exhibit 597. It is not the case that the introduction of this exhibit vastly expanded the theories of either side's case such that the trial court would have been compelled to grant a full-day that while we had certain corporate books to prove tax fraud for a certain number of stores, that the fraud pervaded more generally all of the Happy Pizza stores. And so that was not an expansion of the government's theory through the introduction of this exhibit. In any case, the time that was available at trial was sufficient for the parties to fully explore the significance and the importance of this exhibit. We provide a copy of the exhibit in our appendix. As the court can see, it's just a 35-page spreadsheet of raw numbers. And importantly, neither side really debated what that spreadsheet was. Both sides acknowledged that it was a running total of the profit splits that were split among defendant and other franchise owners. Where did that come from? Did that come off their computers? It wasn't done by the government separately. I mean, it wasn't something like the government made it up as a summary exhibit. No, no, no. It was a spreadsheet taken from a hard drive on one of the that was seized during the execution of the search. The government did not create this document. So unless there are any other questions, I will rest on the briefs with respect to the remaining issues. And just to be affirmed. Thank you. Mr. Loran, you have three minutes for rebuttal. Thank you, sir. While I disagree with the government regarding the issue of standing, it's addressed in some detail in the reply brief. The thing that strikes me about the Franks issue is that it wasn't just a question of the affiant said something that was literally true. The entire premise of the of the application, the Title III application, the entire premise of the Rule 41 affidavit was that something was going on which the affiant knew clearly was not. And that is wide scale drug trafficking by specifically Suma and Galozzi. And it's just a fundamental untruth. There was no way that this could not have been either knowingly misrepresentation, a knowing misrepresentation, or a statement made in reckless disregard of the truth. My friend brings up a specific transaction which was the only contemporaneous account of a drug transaction in the search warrant affidavit. That took place on June 16, 2010. This is the portion of the affidavit in which the case agent says, the person who is supervising the ongoing wiretap, the case agent says, we believe this is half a pound of marijuana. In excruciating detail, we point out how at that time, both before the June 16th transaction and immediately after it, on June 17th, the agents were in possession of information which conclusively showed that we were talking about securing four or five ounces of marijuana for personal use for $400 or $500 apiece. And in fact, on June 17th, the day after the transaction, another monitoring agent refers to the transaction as involving bisla, or per ounce. The evidence would not support a finding that these statements were not misrepresented, knowingly or recklessly misrepresentative. Finally, as to Exhibit 597, I suppose the question is, what would we have done differently if we had gotten a little time to do it? One of the things we might have been able to do is find the person who actually authored this document. And there were significant differences about the accuracy and the meaning of some of the entries in the document. Our accountant never had a real chance to look at it. We never got a chance to track down who may have written it. And so the jury really never heard what it really meant. And that's my time. Thank you for your attention.